**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **LINDA J. SOLOMON**  )<br>**6614 Charles Green Square**  )<br>**Alexandria, VA 22315**  )<br>   *Plaintiff,*  )<br>  )<br>  **v.**  )<br>  )<br>**JOHN F. KARL, JR,**  )<br>**1025 Connecticut Ave. NW**  )<br>**Washington, DC20036**  )<br>   *Defendant.*  )<br>_____ ) | **Civil Action No.**<br><br><br><br>**Jury Demand** |

## COMPLAINT

### JURISDICTION AND VENUE

1. This Court has diversity jurisdiction over this case.

### PARTIES

2. Plaintiff Solomon is a disabled, African-American, female resident of Virginia, who worked as a budget analyst at the United States Department of Agriculture (USDA) before retiring.

3. Defendant Karl is a member of the D.C. Bar.

### BACKGROUND

4. Solomon began working as a budget analyst at the USDA in 1997.

5. Solomon has a history of depression and has been treated by numerous mental health professional, including a psychiatrist Dr. Dennis Cozzens.

6. Her mental health symptoms include unpredictability, problems concentrating and focusing, panic attacks, and agoraphobia.

7. In Spring and Summer 2004, Dr. Cozzens diagnosed Solomon's mental health condition as poor and in a downward cycle.

8. As a result of Solomon's worsening mental health condition, Dr. Cozzens requested that

1

      USDA reasonably accommodated Solomon's disability flexible work schedule.

9. In mid-July 2004, Solomon wrote Dr. Cozzens that she had decided to go forward with a permanent disability package.

10. On August 30, 2004, Solomon and Cozzens completed the Federal Employee Retirement System (FERS) documentation for FERS disability benefits.

11. The FERS documentation submitted on that date include a letter in which Cozzens stated, "it has become clear that disability retirement is the only viable option in this case."

12. On December 16, 2004, Solomon's application for disability benefits was approved.

13. Beginning in January 2005, Solomon began receiving FERS disability benefits.

14. Since that time, Solomon has represented that she cannot return to work because of her disability.

15. On September 25, 2016, and December 29, 2016, Solomon inquired with USDA counsel regarding a retirement card.

16. On January 19, 2017, USDA's counsel informed Solomon, "If she would like a retirement badge, she needs to go to the South Building to have her picture take and the badge issued."

17. On January 16, 2017, USDA's Gregory Parham wrote of Solomon, "She should have received her ID when she processed out at retirement. Since she worked for RD, she should contact the RD HR servicing office (Benefits unit) to check on how she can receive her ID. I do not have a name, but will try to identify one on Tuesday when I return to the office."

18. On September 6, 2007, Solomon retained Karl as her counsel in an employment discrimination action (Rehabilitation Act, ADEA, Title VII) against USDA.

19. The representation agreement provided that Karl would "negotiate a settlement" in consideration for compensation at his "normal hourly rate of $425 per hour.

20. Summary judgment was granted for USDA in *Solomon v. Vilsack*, 656 F. Supp. 2d 55, 57

(D.D.C. 2009) but that decision was vacated in *Solomon v. Vilsack*, 393 U.S. App. D.C. 327, 329, (2010)

21. On remand, in *Solomon v. Vilsack*, 845 F. Supp. 2d 61, 65 (D.D.C. 2012), USDA was granted summary judgment again but in *Solomon v. Vilsack*, 412 U.S. App. D.C. 127, 143, (2014), the Circuit reversed the entry of summary judgment on Solomon's accommodation claim and her claim that revocation of her permission to work late was retaliatory.

22. On January 9, 2015, federal district court Judge Bates referred the case to mediation.[1]

23. On January 4, 2016, Karl provided Solomon with her first bill since the commencement of representation in 2007.

24. The invoice Karl provided to Karl on January 4, 2016 related to legal services provided by Peg Shaw from March 7, 2009 to October 9, 2013.

25. Karl's cover letter provided no explanation regarding why Karl waited more than two years after Shaw's services ceased to provide Solomon with her bill.

26. Shaw's invoice includes only daily billable hours total and does not specify the amount of time spent on particular tasks.

27. Karl's billed Solomon for Shaw's 387.6 hours at his *Laffey* rate for a total of $164,730.

28. Karl provided no explanation why Shaw was entitled to his (Karl's *Laffey* rate).

29. Prior to January 4, 2016, Karl failed to disclose to Solomon that she would be billed for $164,730 for work performed by Shaw.

30. Karl's failure to disclose the extent and rate of Shaw's work violated applicable professional ethics rules related to the use of temporary attorneys as outline in Ethics Opinion 284.

31. On January 6, 2016, Karl provided Solomon with his first bill for legal services that her performed in 2007, 2008, and 2009.

---

[1] ECF No. 97.

32. Like Shaw's invoice, Karl's invoice entries generally include only daily billable hours, but not the amount of time spend on particular tasks.

33. On January 28, 2016, Karl provided Solomon with invoices for 2010, 2011, and 2012.

34. The 2010 invoice provided to Solomon more than five years later, included a May 26, 2010 entry that states "Teleconference with Kristen Hughes and Clerk, U.S. Court of Appeals for the D.C. Circuit, regarding Filing UNDER SEAL."

35. Kristen Hughes was suspended from the practice of law on that date.

36. In the next few months, Karl provided invoices to Solomon for 2013, 2014, 2015, and 2016.

37. Karl has tried to justify or rationalize not sending bills for more than eight years on the grounds that Solomon waived or declined being send invoices.

38. Solomon denies Karl's justifications or rationalizations of his failure to provide bills.

39. Karl's 2007 – 2016 invoices include no entries for "Preparation of Statement of Professional Services Rendered" prior to January 4, 2016.

40. Contrary to standard professional practice and billing related ethics rules, Karl did not prepare invoices (Preparation of Statement of Professional Services Rendered") from 2007 to 2015.

41. Karl prepared the invoices ("Statements of Professional Services") on January 3, 2016, January 4, 2016, January 5, 2016, January 25, 2016, January 26, 2016, January 27, 2016, January 28, 2016, February 6, 2016, February 7, 2016, and February 9, 2016.

42. Although Karl has tried to justify or rationalize not sending Solomon invoices for more than eight years, he has provided no justification or rationalization for preparing invoices years after the hours in question were billed.

43. On February 5, 2016, Karl sent Solomon a copy of *Fogg v. Ashcraft,* 254 F.3d. 103 (D.C. Cir. 2001) without any subsequent history.

44. Karl's February 5, 2016, invoice entry billed Solomon for .5 of an hour for tasks that included.

"Preparation and review of emails; preparation of letter re *Fogg* and cap on damages; review of *Fogg* decision."

45. Given that Karl also wrote and viewed emails, and prepare a letter on *Fogg* in that half hour, his review of *Fogg* was cursory.

46. Karl's *Fogg*-related invoice entry makes no mention of subsequent history or Shephardizing.

47. The subsequent history for *Fogg v. Ashcraft,* supra, includes negative analysis.

48. Karl mentioned no negative history or any subsequent history in his letter to Solomon.

49. Karl's February 5, 2016 cover letter stated that *Fogg* "explains that cap on damages."

50. Karl's February 5, 2016 cover letter directed Solomon to "pages 107-108."

51. Pages 107 to 108 of the *Fogg* decision do not include the Circuit's holdings.

52. Pages 107 to 108 cite the statute, frame the question, and discuss Fogg's position.

53. By directing Solomon to pages 107-108, Karl directed attention away from footnote 1 which provides, "The Supreme Court recently affirmed . . . that front pay is not an element of 'compensatory damages' within the meaning of 42 U.S.C. § 1981 and therefore not subject to the damages cap imposed by that section." *Fogg v. Ashcraft*, 349 U.S. App. D.C. 26 n.1

54. Karl failed to inform Solomon on February 5, 2016 that *Fogg v. Gonzales*, 407 F. Supp. 2d 79, 88 (D.D.C. 2005) held, "Back pay is a form of equitable relief under Title VII . . . and is not subject to the cap on compensatory damages. See 42 U.S.C. § 1981a(b)(2)"

55. Despite being a non-attorney, Solomon read *Fogg* to hold that the $300,000 cap was limited to compensatory damages only, not total damages.

56. Based on her reading of *Fogg*, Solomon concluded that Karl's misrepresented *Fogg* as capping total damages at $300,000 not just compensatory damages.

57. Solomon believed Karl misrepresented Fogg to cajole her into settling for $300,000.

58. On February 4, 2016, Solomon e-mail Karl and complained about an "abusive call" in which

Karl was "unprofessional and unethical," his threat to "sue me (1) if I don't take your advice in mediation and (2) if I don't agree to a 50/50 . . . division of the government's pure cash settlement" and "a bill, which appears that you and Peg Shaw just made up."

59. Based on the abusive call, Karl's unprofessional and unethical conduct, Karl's threats to sue her, Karl's insistence on a 50% of her settlement monies, Karl's provision of invoices more than 8 years after representation began, Karl's failure to disclose that Shaw performed 387.6 hours of work for $164,730, and his misrepresentation of *Fogg*, Solomon decided to fire Karl.

60. On February 6, 2016, Solomon discharged Karl.

61. The next day, Karl promised to withdraw and provided a consent to withdraw form.

62. According to Saul Singer of the Office of Disciplinary Counsel (ODC) of the D.C. Bar, a discharged attorney should withdraw within a day of their termination.

63. Karl waited until May 11, 2016 to file a withdrawal. [2]

64. Karl's withdrawal was granted by Judge Bates on May 31, 2016.[3]'

65. Despite his discharge on February 6, 2016, Karl continued to bill Solomon for the next three months.

66. Karl's post-termination billing is detailed at pages 46 – 48 of his invoices.

67. On April 26, 2017, Karl lied and claimed, "Your statements that Ms. Solomon was billed for services rendered after she discharged me are incorrect."

68. Karl's post-discharge billing including dozens of ex parte calls to the Mediator Wind and USDA counsel to which Solomon did not consent and in which she did not participate.

69. Karl's February 7, 2016 response to his firing reiterated his earlier claim that Fogg capped all damages at $300,00, "I have provided you with a copy of the statute, 42 U.S.C. § 1981(a),

---

[2] ECF. No. 107.
[3] ECF No. 110.

and the case law. This [$300,000] is an immutable ceiling on the amount of damages you can receive, no matter how much you believe you have suffered."

70. Karl's February 4, 2016 letter did not "provide the case law" - i.e. the case law found in the subsequent history of *Fogg v. Gonzales*, 407 F. Supp. 2d 79, 88 (D.D.C. 2005).

71. Solomon's subsequent settlement in August 2016 proved that her total damages were not capped, as Karl claimed, at $300,000.

72. Karl's February 7, 2016 response threatened, "Shortly after I file the Motion to Withdraw as your counsel, I will file a Notice of Lien . . . The UDA is required to honor this lien."

73. USDA did not honor the lien Karl filed subsequently on August 14, 2016.

74. For four months after his termination, and even after his withdrawal was granted, Karl improperly participated in district-court-referred mediations and settlement negotiations.

75. Karl's improper inclusion and participation in mediations and mediation-related settlement negotiations was referred to the Compliance Judge for the U.S. District Court Mediation program on March 15, 2017 and is under investigation at this time.

76. At the outset of settlement negotiations, a February 26, 2016, a status report stated, "The parties have come to an Agreement to settle this matter. Today, defense counsel received the necessary approval of the settlement amount from within the Department. The parties anticipate that all papers pertaining to the settlement will be finalized by next week."[4]

77. Karl's subsequent insistence on direct payment of 50% of Solomon's settlement monies prevented settlement.

78. On March 18, 2016, Karl e-mailed Solomon and requested the deposit of "$500,000 into a joint account at a major bank of your choosing."

79. On March 25, 2016, Solomon replied to Karl, "The division of 50% of my settlement to you

---

[4] ECF No. 105.

would amend our contract, in your favor, which I do not intend to do. . . . You wanting us to split my settlement 50/50 and have a joint account is absolutely hilarious."

80. On March 25, 2016, Solomon also responded to Karl, "THERE IS 'NOTHING' IN OUR CONTRACT THAT SAYS YOU ARE TO BE PAID FROM THE GOVERNMENT."

81. On March 22, 2016, Karl wrote Solomon, "There are two issues left to resolve. The first is when I file the motion to withdraw. . . I postponed the motion to withdraw so that could negotiate the best possible settlement for you.

82. Karl postponed the motion to withdraw to negotiate the best possible settlement for Karl.

83. On March 22, 2016, Karl wrote Solomon, "The second issue is whether I have your consent to withdraw."

84. Despite raising the issue on March 22, 2016, Karl waited nearly two months to withdraw.

85. A March 25, 2016, status report stated, "The parties have come to an Agreement to settle this matter. Defense counsel received the necessary approval of the settlement amount from within the Department. Plaintiff is continuing her review of the draft Settlement Agreement prepared by counsel for Defendant. The parties anticipate that all papers pertaining to the settlement will be finalized shortly."

86. On April 4, 2016, Solomon again refused to pay Karl's fees directly from her settlement monies, writing "Yeah well, we didn't agree'[] for my settlement to go into YOUR trust account in the 2016 settlement. . . . I will pay you in accordance with your contract."

87. On May 5, 2016, Solomon wrote to Karl, "You have been threatening to withdraw, so far as I could see, since February 2016 and you should do so, rather than threat, because you are impeding my settlement agreement with the government."

88. On May 10, 2016 Karl claimed he was owed fees and costs of "$722,627.50."

89. From May 27, 2016 through May 29, 2016, Karl and Solomon had a heated series of email

exchanges regarding settlement and other matters.

90. In one of those emails Karl wrote, "I suggest you speak to your son because your paranoia and your depression are impairing your judgment."

91. Karl website lists no qualifications or training regarding the diagnosis of mental illness.

92. On May 31, 2016, Karl's withdrawal was granted.

93. Despite the grant of withdrawal, Karl continued to participate in Solomon's case, mediations and settlement negotiations, to dispense unwanted advice to Solomon and to threaten her.

94. On June 9, 2016, Karl emailed Solomon, "I tried to reach you by phone on both of your numbers. making yourself unavailable by phone is not in your best interests."

95. Because Karl had withdrawn 10 days earlier, Solomon wrote to Karl on June 9, 2016, "Why are you emailing me and calling me? To my knowledge you are out of this case/settlement agreement, so we have no further business after May 31, 2016."

96. Despite his discharge on February 6, 2016, Karl billed Solomon until May 10, 2016.

97. A June 13, 2016, status report stated in part, "Defendant has provided the Settlement Agreement to Plaintiff. Plaintiff has maintained that she cannot sign the Agreement because: (1) Plaintiff has not agreed to pay attorney's fees from the settlement amount. . .."[5]

98. A July 6, 2016 Order from Judge Bates stated, "Almost a decade old, this case recently appeared to be on the verge of resolution, but now has stalled. Perhaps no settlement is possible, in which case plaintiff Linda Solomon must either take steps to advance this litigation or face dismissal. But at this juncture the Court thinks it will be worthwhile to resubmit this case to mediation in an effort to salvage the near-resolution previously achieved and to appoint Ms. Solomon new counsel for that limited purpose."[6]

---

[5] ECF No. 112.
[6] ECF No. 113.

99. On July 17, 2016, retained the undersigned to settle the case.

100. Within days, the undersigned gained a meeting of the minds with USDA's counsel Assistant United States Attorney Heather Graham Oliver on a revised settlement agreement.

101. The revised settlement agreement drafted by the undersigned Dr. Stephens after consultation with Solomon and Graham Oliver left unchanged the gross settlement total of $999,999.00 but designated "Three Hundred Thousand Dollars ($300,000) shall be paid as compensatory damages for physical illness and emotional distress arising from that physical illness."

102. The language related to compensatory damages track IRS Publication 4345 (Rev. 12-2016).

103. Karl's figures for total attorney's fees owed by Solomon are inconsistent over time.

104. On May 10, 2016 Karl claimed he was owed fees and costs of "$722,627.50."

105. In his August 14, 2016 Lien Notice, Karl claimed he is owed $728,195.00 in attorney's fees.

106. In his Memorandum, filed the dame day, Karl listed the amounts owed as $730,909.00.

107. In his Complaint in D.C. Superior Court, Karl claimed the amount owed was "728,407.50."

108. In October 2015, Solomon's monies were paid directly to her by USDA.

109. On or after August 14, 2016, Karl filed a series of motions, responses and replies in this case.

110. On or after the Fall 2016, Karl has claim split by filing of duplicative motions and pleadings in two other forums (D.C. Superior Court and the D.C. Circuit).

111. On or after Fall 2016, to gain legal fees unavailable to a pro se party, Karl has pretended that Kristen Hughes serves as his counsel when in fact he represents himself.

112. On March 28, 2017, Karl acted as his own counsel in a deposition of Solomon.

113. In that deposition, Karl falsely claimed that nearly all of the objections of Solomon's counsel constituted coaching.

114. In that deposition, Karl badgered Solomon by asking her the same questions repeatedly on a number of occasions.

115. In that deposition, Karl's badgering brought Solomon to tears.

116. In that deposition, the stenographer was so concerned about Solomon's physical well being that the stenographer asked if Solomon needed a break.

117. In that deposition, Karl attempted to physically seize a attorney client privileged post-it note that Solomon's counsel showed to her at the outset of her testimony.

118. After that deposition, Solomon was so traumatized emotionally and physically that she was unable to participate in her case for several months.

## ALLEGATIONS

The above averments of fact are incorporated herein.

### Count I: Breach of Fiduciary Duty

As the attorney or former attorney for Linda Solomon, John Karl owed Linda Solomon a fiduciary duty. Karl breached both his duty of loyalty and his duty of candor. Karl breached his duty of loyalty prevented and delayed her settlement resulting in money and compensatory damages. Karl's breach of his duty of candor, including his failure to disclose the amount of legal fees owed until more than 8 years after representation deprived Solomon of information required to make reasonable judgments regarding settlement. Karl's willful and knowing breaches warrant punitive damages.

### Count II: Malpractice

As the attorney or former attorney for Linda Solomon, John Karl owed Linda Solomon a duty of care in billing and the consent and disclosure of the role and cost of a temporary attorney. Karl breached his duty of care in the preparation of his invoices, the timely provision of invoices, and disclosure of the role and cost of Peg Shaw. Karl breached those duties by block billing, failing to provide invoices for more than eight years, and failing to comply with ethical rules and guidance regarding the consent and disclosure of the work of a temporary attorney in D.C Ethics Opinion 284.

### Count III: Malpractice II

As the attorney or former attorney for Linda Solomon, John Karl owed Linda Solomon as duty of care to withdraw when terminated and to cease willing when terminated. Karl breached those duties by failing to withdraw for months after termination and billing Solomon for $9834.50 for 23.14 hours of purportedly billable hours performed after he was termination by Solomon.

### Count IV: Negligent Supervision

As the attorney retained by Linda Solomon and lead counsel, John Karl owed Solomon a duty of care in the supervision of the temporary attorneys (Kristen Hughes and Peg Shaw) whom he included in the case. Karl breaches that duty of care by allowing Kristen Hughes to participate in the case on May 26, 2010 when he knew Kristen Hughes was suspended from the practice of law. Karl beached that duty of care by allowing Peg Shaw to bill all of her hours using block billing.

### Count V: Intentional Infliction of Emotional Distress

On or after August 2016, by his extreme and outrageous conduct of vexatiously splitting claims and filing dozens of harassing and vexatious pleadings, motions and notices in three different forums, John Karl intentionally inflicted severe emotional distress on Linda Solomon.

### Count VI: Intentional Infliction of Emotional Distress

On March 28, 2017, by his extreme and outrageous conduct in the deposition of Linda Solomon, John Karl intentionally inflicted severe emotional distress on Linda Solomon.

### Count VII: Fraulent Misrepresentation

Since Fall 2016, John Karl has falsely represented that Kristen Hughes is his counsel, knowing such representations to be false, with the intention of inducing D.C. Superior Court, the D.C. Circuit and D.C. District Court to rely in those representation and award him attorney's fees, despite the fact that Karl serves as his own counsel and Hughes is simply his hand puppet. Like Karl's claims splitting and vexatious pleadings and motions, this ruse is perpetrated to increase Solomon's legal fees.

## REMEDIES[7]

1. Monetary damages of $75,393.36 in investment income and interest that Solomon lost in the period from February 8, 2016, the date when Solomon fired Karl, to the date, on or about October 26, 2016, the date when Solomon received her settlement monies from USDA.

2. Compensatory damages of $301,573.55.

3. Punitive damages of $1,206,293.76.

4. Attorneys fees and costs.

/S/ *Glenn Stephens* **2/19/2018**

Glenn Stephens Ph.D., Esq.
Bar No. # 472780
Federal Employees Defense, LLC 1725
I Street NW, Suite 300
Washington, DC 20006
202-258-6521
Drghs3@gmail.com

---

[7] Even if the percentage interest used is 1%, total damages amount exceed $75,000 for jurisdictional purposes.

**CERTIFICATE OF SERVICE**

On October February 19, 2018, a copy of the above was e-filed.

                                                          **/S/**   *Glenn Stephens* **2/19/2018**
Glenn Stephens Ph.D., Esq.
Bar No. # 472780
Federal Employees Defense, LLC
1725 I Street NW, Suite 300
Washington, DC 20006
202-258-6521
drhghs@gmail.com